Ellen W. **SCHRECKER**, Appellant,

v.

**U.S. DEPARTMENT OF JUSTICE, Appellee.**

No. 00–5033.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 19, 2001.

Decided June 26, 2001.

James H. Lesar argued the cause and filed the briefs for appellant.

Michael J. Ryan, Assistant U.S. Attorney, argued the cause for appellee. With him on the briefs were Wilma A. Lewis, U.S. Attorney at the time the briefs were filed, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: WILLIAMS, GINSBURG and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Ellen Schrecker appeals the judgment of the district court rejecting her claims that the Federal Bureau of Investigation violated the Freedom of Information Act, 5 U.S.C. § 552, by failing to conduct an adequate search for information responsive to her FOIA request, and that both the FBI and the National Labor Relations Board violated that Act by improperly withholding responsive information they had located. *See Schrecker v. U.S. Dep't of Justice*, 74 F.Supp.2d 26 (D.D.C.1999). We reverse with respect both to the adequacy of the search and to one aspect of Schrecker's claim regarding Exemption 7(C) of the FOIA. With respect to her other claims, we affirm.

## I. Background

In October 1988 Schrecker filed a FOIA request seeking information regarding Gerhard Eisler and Clinton Jencks, suspected communists whom the FBI had investigated in the 1940s and 1950s. The FBI released some documents to Schrecker and withheld others pursuant to various exemptions to the FOIA. In 1994 Schrecker filed a new request for the same information and, less than two months later, initiated this lawsuit.

In 1998 the district court directed the FBI to reprocess all responsive material. *Schrecker v. U.S. Dep't of Justice*, 14F.Supp.2d 111, 117 (D.D.C.1998) ("Under the FBI's own admission, a 'significant portion,' of its withholdings may have been inappropriate.... [T]his court orders that the defendant reprocess all withholdings and submit appropriate affidavits regarding any future withholdings"). After reprocessing the responsive material, the Government prepared a Vaughn index stating, with respect to a sample of the disputed material, its basis for withholding each item. Subsequently, the district court granted the Government's motion for summary judgment.

## II. Analysis

Upon appeal Schrecker argues that the Government conducted an inadequate search for documents and improperly withheld information pursuant to a number of exemptions to the FOIA.

### A. *Adequacy of Search*

■ Schrecker argues the FBI conducted an inadequate search because it did not search for "ticklers." As this court explained in *Campbell v. United States*, 164 F.3d 20, 27 n. 1 (1998):

A "tickler" is a duplicate file containing copies of documents, usually kept by a supervisor. Such files can be of interest to a FOIA requester because they could contain documents that failed to survive in other filing systems or that include unique annotations.

The Government acknowledges both that there were at one time ticklers for certain FBI files responsive to Schrecker's request and that it did not search for them, but it argues that it did not need to do so because ticklers are not indexed to the FBI's Central Records System. We are not a little dismayed by the Government's position, for we rejected this self-same argument in *Campbell*. *Id.* at 28 (holding that where FOIA request includes ticklers and agency's initial search reveals that responsive ticklers existed at one time, then a search for ticklers is presumptively necessary). As the Government must know, this panel is bound not only by good sense but also by circuit law to reject this argument once again. *See, e.g., Brewster v. Commissioner of Internal Revenue*, 607 F.2d 1369, 1373–74 (D.C.Cir.1979) (panels bound to follow circuit precedent until en banc court or Supreme Court overrules that precedent).

Next the Government argues it need not search for the ticklers responsive to Schrecker's request because, under FBI policy during the time it investigated Eisler and Jencks, ticklers were to be retained for only 60 days. The Government acknowledges that the FBI granted requests to retain some ticklers past the 60 day mark, but it explains that even those documents were retained "with the understanding that they will be disposed of as soon as they no longer serve a useful purpose." *See, e.g.,* Memoranda to Mr. Boardman from A.H. Belmont re: Retention of Ticklers, Domestic Intelligence Division, dated August 5 and November 9, 1955. Schrecker points out, however, that there is no evidence the reprieved documents were ever destroyed despite the FBI's practice of "recording the destruction of records." The Government does not rebut this argument and, without such evidence, the standard "no longer serv[ing] a useful purpose" is simply too vague to obviate the need for a search. Under that standard, the ticklers might well be extant in the files of some cautious bureaucrat.

Finally, the Government argues that searching for ticklers would be unduly burdensome. We readily acknowledge that "there are some limits on what an agency must do to satisfy its FOIA obligations." *Nation Magazine, Washington Bureau v. U.S. Customs Serv.,* 71 F.3d 885, 891–892 (D.C.Cir.1995) (holding search through 23 years of unindexed files would impose unreasonable burden upon agency). Schrecker claims, however, and the Government does not deny, that in other cases the FBI has managed to locate ticklers:

> For example, in connection with the FBI's investigation into the assassination of Dr. Martin Luther King, Jr., a file of several hundred tickler copies was maintained by FBI Supervisor Richard Long . . . . In another instance, the FBI processed some twenty volumes of ticklers compiled in connection with the assassination of President John F. Kennedy.

Nor does the Government deny that the Bureau retains the files of higher-level supervisors after they depart, or that in the past it has managed to locate ticklers in the files of such higher-ups. It is not improbable, therefore, that the Bureau both has the files of some supervisors who received ticklers in the Eisler and Jencks investigations and that those files are indexed and include the responsive ticklers. Schrecker observes further that "[s]ome of the files of the high supervisory officials listed on the Eisler and Jencks records as recipients of ticklers may already have been processed for public release and can be searched for ticklers pertaining to these cases." In response to this observation, the Government raises the prospect that a search for ticklers might "compel[ ] an agency-wide, desk-to-desk, manual search for ticklers," but it points to nothing in the record to suggest that the search actually required will be unduly burdensome. Accordingly, we reverse the judgment of the district court on this claim.

B. *Exemption 1*

■ Exemption 1 to the FOIA permits an agency to withhold information if it is "specifically authorized under criteria established by an Executive order" to do so "in the interest of national defense or foreign policy." 5 U.S.C. § 552(b)(1). In this case, Schrecker argues that the FBI erred in withholding information pursuant to Exemption 1 because, among other things, it withheld documents related to the identity of confidential sources under the theory that "[a]ll sources, dead or alive, active or inactive, must be protected for all time because otherwise current and potential sources will fear revelation of their identities at some point." According to Schreck-

er, this rationale for withholding is too broad because it would "recreate[ ] the presumption of damage to national security due to disclosure of an intelligence source which EO 12958 eliminated."

The Government responds that it did not apply a presumption but, rather, pursuant to Executive Order 12958 considered the potential harm of releasing information about the sources implicated in this case and concluded the information should be withheld in order to protect national security. Specifically, the Government's declarant, Scott Hodes, testified that he:

> personally and independently . . . . determined that the remaining portions of classified information . . . are exempt from automatic declassification pursuant [to] EO 12958, § 3.4(b) as the release of the specific information should be expected to reveal the identity of a confidential human source . . . or reveal the identity of a human intelligence source when the unauthorized disclosure of that source would clearly and demonstrably damage the national security interests of the United States . . . . [by harming] the FBI's ability to . . . continuously recruit sources for current and future use.

Second Hodes Declaration at 13–14; *see also* Third Hodes Declaration at ¶ ¶ 3, 7.

While the affidavit is not entirely free of ambiguity, we think it is most naturally to be read, as the Government suggests, to say the FBI considered each source — confidential or otherwise — and determined in each case that release of the information in question would damage national security by dissuading current and future sources from cooperating. Accordingly, we affirm the judgment with regard to information related to the identity of intelligence sources.

## C. *Exemption 7(C)*

■ Exemption 7(C) permits an agency to withhold information compiled "for law enforcement purposes" if that information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). In determining whether release of particular information is an "unwarranted" invasion of privacy, an agency must balance the type of privacy interest at stake against the public interest in release of the type of information involved. *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).

■ Schrecker argues that in this case the FBI improperly withheld information pursuant to Exemption 7(C) in part because it failed to conduct an adequate investigation into whether the individuals whose privacy might be invaded are deceased. As the FBI concedes, the death of the subject of personal information does diminish to some extent the privacy interest in that information, though it by no means extinguishes that interest; one's own and one's relations' interests in privacy ordinarily extend beyond one's death. *See, e.g., Swidler & Berlin v. U.S.,* 524 U.S. 399, 406, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) ("the attorney-client privilege continues after death"); *Accuracy in Media, Inc. v. National Park Serv.,* 194 F.3d 120, 121 (D.C.Cir.1999) (noting precedent under FOIA holding privacy interests continue after death). The fact of death, therefore, while not requiring the release of information, is a relevant factor to be taken into account in the balancing decision whether to release information.

■ The FBI explained as follows its efforts to establish death in this case: "if we were aware that an individual was 100 years of age or older, or we were able to determine from *Who Was Who* or from

other readily available information that individuals were deceased, we released their identities." Second Hodes Decl., ¶ 40. Upon inquiry at oral argument, the Government represented that the "other readily available information" to which the quoted affidavit refers includes the Social Security database and the agency's internal records. Although we find support in the record for the latter, we cannot fairly read the vague wording used by the declarant under oath as a statement that the Bureau consulted the Social Security database. Without confirmation that the Government took certain basic steps to ascertain whether an individual was dead or alive, we are unable to say whether the Government reasonably balanced the interests in personal privacy against the public interest in release of the information at issue. We therefore reverse this aspect of the judgment; on remand the Government may document what "other readily available information" it consulted, and the district court can decide in the first instance whether the Government did all it should have done, and whether it may withhold the disputed information pursuant to Exemption 7(C).

Relatedly, Schrecker argues that the Government failed to weigh the privacy interests of the people it assumed were alive, opting instead for a per se rule of withholding. The Government denies using a per se rule and points us to the Second Hodes Declaration at ¶ 40:

> In asserting this exemption, each piece of information was scrutinized to determine the nature and strength of the privacy interest of any individual whose name and/or identifying data appears in the documents at issue. In withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure. In each instance where information was withheld, it was determined that individual priva-

cy interests were not outweighed by any public interest.

Although the next few sentences of the declaration appear to state general principles rather than relate how the facts of this case were weighed in the balance, the quoted passage establishes that "in each instance where information was withheld," the agency considered the private and public interests at stake. We therefore affirm the judgment of the district court with regard to this claim.

### III. Conclusion

Schrecker raises a number of other arguments against the Government's invocation of various exemptions to the FOIA, all of which we reject for substantially the reasons given by the district court. *See Schrecker*, 74 F.Supp.2d 26. With respect both to the adequacy of the search for ticklers and to the applicability of Exemption 7(c), we reverse the judgment of the district court and remand this matter for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.

*So ordered.*