Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued October 17, 2003      Decided November 18, 2003

No. 02-5317

ELLEN W. SCHRECKER,
APPELLANT

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLEE

————

Appeal from the United States District Court
for the District of Columbia
(No. 95cv00026)

————

*James H. Lesar* argued the cause and filed the briefs for
appellant.

*Michael J. Ryan*, Assistant U.S. Attorney, argued the
cause for appellee. With him on the brief were *Roscoe C.
Howard, Jr.*, United States Attorney, and *R. Craig Lawrence*,
Assistant United States Attorney.

————

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

*Michael E. Tankersley* was on the brief for *amici curiae* Public Citizen, Inc., et al. in support of appellant.

Before: Ginsburg, *Chief Judge*, Edwards, *Circuit Judge,* and Williams, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* Edwards.

Edwards, *Circuit Judge*: Ellen Schrecker appeals the District Court's decision granting summary judgment to the U.S. Department of Justice ("the Government"), in a case arising out of Schrecker's Freedom of Information Act ("FOIA") request for Federal Bureau of Investigation ("FBI") records relating to McCarthy-era investigations of Gerhart Eisler and Clinton Jencks. The Government produced over 24,000 pages of responsive documents, but redacted names and other information identifying third-party individuals mentioned in those records pursuant to Exemption 7(C) in FOIA. Exemption 7(C) permits an agency to withhold information compiled for law enforcement purposes where disclosure of such information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (1996).

In a prior appeal involving the same parties, we remanded the case to the District Court in order for the Government to show that it had taken "certain basic steps" to ascertain whether the individuals whose names were withheld under Exemption 7(C) are living or dead. *Schrecker v. United States Dep't of Justice*, 254 F.3d 162, 167 (D.C. Cir. 2001). Schrecker now challenges the District Court's findings on remand that the Government's efforts were adequate and that nondisclosure of the information under Exemption 7(C) is justified. *See Schrecker v. United States Dep't of Justice*, 217 F. Supp. 2d 29 (D.D.C. 2002). We affirm the judgment of the District Court.

## I. Background

This appeal is the latest installment in a saga that began 15 years ago. Appellant Ellen Schrecker is a history professor, a published author, and an expert on McCarthyism. In 1988,

she submitted a FOIA request for FBI records on Gerhart Eisler and Clinton Jencks. Both were the subjects of FBI investigations during the McCarthy Era, in 1947 and 1953, respectively. *Schrecker v. United States Dep't of Justice*, 14 F. Supp. 2d 111, 114 (D.D.C. 1998). Schrecker resubmitted her request in November 1994, after the Government withheld a portion of the documents responsive to her initial request. Two months later she initiated this law suit in the District Court, challenging the adequacy of the FBI's releases. *Id.*

In 1998, after the Government had conceded that "a 'significant portion' of its withholdings may have been inappropriate," the District Court ordered the Government to reprocess all withholdings from responsive documents. *Id.* at 117. After reprocessing, the Government prepared a 100-page *Vaughn* index from over 24,000 pages of responsive documents. *See Schrecker v. United States Dep't of Justice*, 74 F. Supp. 2d 26, 28 (D.D.C. 1999). A *Vaughn* index describes the information withheld from a sample of the responsive documents selected by the requesting party and explains the relevance of the FOIA exemption under which each item is withheld. *See Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974).

In 1999, the District Court granted the Government's motion for summary judgment, upholding the Government's decision to withhold information from the responsive documents on the basis of six FOIA exemptions, including Exemption 7(C). *Schrecker*, 74 F. Supp. 2d at 29-35. On appeal, we affirmed the District Court's decision with two exceptions. We first held that because the Government had acknowledged the previous existence of responsive "ticklers" (duplicate files, usually maintained by FBI supervisors, that contain copies of documents which may not have survived in other filing systems and may contain unique annotations), the Government was required to search for these records. *Schrecker*, 254 F.3d at 164-65.

More relevant for the instant appeal, we found that the record was not sufficiently developed to permit proper review

of the Government's invocation of Exemption 7(C). The fact of an individual's death, we held, is a relevant factor in determining whether the Government properly withheld the individual's personal information under Exemption 7(C). *Id.* at 166. The Government affirmed that it had investigated whether the relevant individuals were deceased, relying on several clues and sources: (1) *Who Was Who*, a book of famous individuals; (2) the "100-year rule," which presumes that an individual is dead if his or her birth date appears in the responsive record and is more than 100 years old; and (3) "other readily available information." The record showed that the "other readily available information" included internal FBI records, but it was unclear as to whether it also included the Social Security Death Index ("SSDI"), a privately maintained database using Social Security Administration data. *Id.* at 166-67.

We held that, "[w]ithout confirmation that the Government took certain basic steps to ascertain whether an individual was dead or alive, we are unable to say whether the Government reasonably balanced the interests in personal privacy against the public interest in release of the information at issue." *Id.* at 167. We reversed the District Court's grant of summary judgment on the Exemption 7(C) withholdings and remanded the case for further proceedings. The court instructed that, on remand, the Government should be permitted to document the "other readily available information" upon which it relied. The District Court then could properly evaluate whether the Government "did all it should have done" and, on this basis, determine whether the Exemption 7(C) withholding was justified. *Id.*

On remand, the District Court again granted summary judgment for the Government, relying in significant part on two declarations from Scott A. Hodes, then Acting Chief of the Litigation Unit, Freedom of Information-Privacy Acts Section at FBI Headquarters. *See Schrecker*, 217 F. Supp. 2d at 34-38. The court found that the Government's search for responsive "ticklers" satisfied the Government's duty under FOIA. *Id.* at 34-35. With regard to Exemption 7(C), the court found that the Government had investigated the life

status of the individuals whose names were withheld, using the following clues and sources: *Who Was Who*; the 100-year rule; previous FOIA requests; "internal sources"; and SSDI searches where the individual's social security number appeared in the responsive records. *Id.* at 37. The District Court rejected Schrecker's argument that the FBI should use name-based searching of the SSDI when social security numbers are not available, finding that a social security number is necessary to verify that an individual listed in the database is the same individual appearing in the responsive document. The court found that it would be unduly burdensome for the Government to search unresponsive files for the social security number of every individual mentioned in a responsive document. *Id.* at 38.

The District Court accordingly held that the Government had done all it was required to do in investigating whether the individuals whose personal information was withheld were dead. The court also concluded that the Government had appropriately balanced privacy and public interests in withholding the information under Exemption 7(C) and, therefore, held that the Government was entitled to summary judgment. *Id.* at 38-39. Schrecker now appeals the District Court's decision as to the Exemption 7(C) issues. Public Citizen, Inc., and seven other organizations ("Amici") were granted leave by the court to file a joint amicus brief in support of Schrecker.

## II. ANALYSIS

### A. FOIA Exemption 7(C)

FOIA Exemption 7(C) provides, in relevant part, that an agency may withhold "records or information compiled for law enforcement purposes" to the extent that their production "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (1996). Exemption 7(C) requires the agency and the reviewing court to weigh the public interest in the release of information against the privacy interest in nondisclosure. *See United*

*States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989).

The public interest in disclosure must be evaluated in light of FOIA's central purpose: "to open agency action to the light of public scrutiny." *Id.* at 772 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976)). This inquiry, moreover, should focus not on the general public interest in the subject matter of the FOIA request, but rather on the incremental value of the specific information being withheld. *See, e.g.*, *King v. United States Dep't of Justice*, 830 F.2d 210, 234 (D.C. Cir. 1987).

On the privacy side of the ledger, our decisions have consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, and informants. *See Fitzgibbon v. Cent. Intelligence Agency*, 911 F.2d 755, 767-68 (D.C. Cir. 1990); *Keys v. United States Dep't of Justice*, 830 F.2d 337, 347-48 (D.C. Cir. 1987); *King*, 830 F.2d at 234-35; *Senate of the Commonwealth of Puerto Rico Judiciary Comm. v. United States Dep't of Justice*, 823 F.2d 574, 588 (D.C. Cir. 1987); *Bast v. Fed. Bureau of Investigation*, 665 F.2d 1251, 1254-55 (D.C. Cir. 1981); *Lesar v. United States Dep't of Justice*, 636 F.2d 472, 487-88 (D.C. Cir. 1980). In *Safecard Services, Inc. v. SEC*, we adopted a categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is "necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity." 926 F.2d 1197, 1206 (D.C. Cir. 1991); *see also Nation Magazine, Washington Bureau v. United States Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995) (explaining and reaffirming the *Safecard* rule). Although the court has held that "government officials do not surrender all rights to personal privacy when they accept a public appointment," *Bast*, 665 F.2d at 1255, we have not had occasion to decide whether the *Safecard* rule applies to former officials no longer in government service.

We have recognized, however, that the privacy interest in nondisclosure of identifying information may be diminished where the individual is deceased. "The fact of death, therefore, while not requiring the release of information, is a relevant factor to be taken into account in the balancing decision whether to release information." *Schrecker*, 254 F.3d at 166; *accord Campbell v. United States Dep't of Justice*, 164 F.3d 20, 33-34 (D.C. Cir. 1998); *Summers v. Dep't of Justice*, 140 F.3d 1077, 1084-85 (D.C. Cir. 1998) (Silberman, J., concurring). Therefore, in the instant case, we must review the District Court's holding that the Government has taken the necessary "basic steps to ascertain whether an individual was dead or alive."

## B. The Instant Appeal

With this background in mind, we now turn to Schrecker's challenge to the District Court's decision. We review *de novo* a decision granting summary judgment to an agency claiming to have complied with FOIA. *Nation Magazine*, 71 F.3d at 889.

### 1. The "Reasonable Efforts" Standard

Schrecker's principal claim on appeal is that the Government's methods for determining life status are inadequate. She asserts that an agency's FOIA search methodology must be "reasonably calculated" to produce the information sought. *See, e.g.*, *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). Schrecker alleges that the Government's search methods in this case are highly unlikely to reveal whether an individual is living or dead, and cites as evidence the Government's failure to identify any specific instance in which its methods resulted in the disclosure of a name.

In *Campbell*, we held that "[a] court balancing public interests in disclosure against privacy interests must ... make a reasonable effort to account for the death of a person on whose behalf the FBI invokes exemption 7(c)." 164 F.3d at 33 (citing *Summers*, 140 F.3d at 1084-85 (Silberman, J., concurring); *id.* at 1085 (Williams, J., concurring)). In undertaking the review required by *Campbell*, a court must

assure itself that the Government has made a reasonable effort to ascertain life status. And the Government's efforts must be assessed in light of the accessibility of the relevant information. *See Summers*, 140 F.3d at 1085 ("[T]here would be a question whether the Bureau's invocation of the privacy interest represented a reasonable response to the FOIA request, at least *if the Bureau has, or has ready access to, data bases that could resolve the issue.*" (emphasis added)); *see also Truitt*, 897 F.2d at 542 ("The adequacy of an agency's search is measured by a 'standard of reasonableness,' and is 'dependent upon the circumstances of the case.'" (footnote and citation omitted)). We have cautioned, however, that it would be inappropriate for the court to mandate "a bright-line set of steps for an agency to take in this situation. FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro manage the executive branch." *Johnson v. Executive Office for United States Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002).

The failure to discover the information sought is not conclusive evidence that the agency has failed to make a reasonable effort. *See id.* at 775-76 (upholding the adequacy of the Government's efforts despite its failure to determine whether the individuals in question were alive or dead); *see also, e.g.*, *Weisberg v. United States Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (The relevant issue "is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." (emphasis in original)). The reviewing court therefore should not focus primarily on the agency's rate of success in unearthing the information sought. Rather, the proper inquiry is whether the Government has made reasonable use of the information readily available to it, and whether there exist reasonable alternative methods that the Government failed to employ.

Schrecker's criticisms of the Government's methods are numerous, but ultimately she advocates only two alternatives: name-based searching of the SSDI and replacement of the

100-year rule with an alternative presumption. On the record at hand, we see no merit in the alternative methods proposed by Schrecker.

### 2. *The Scope of Application of the Government's Methods*

Before turning to Schrecker's method-specific arguments, we pause to address her threshold objection that the affidavits submitted in support of the Government's motion for summary judgment are fatally vague. Specifically, she points to the Fifth and Sixth Hodes Declarations' reference to use of certain tools as a matter of "discretion" or "where possible" as calling into question whether the tools were actually applied to all the information withheld under Exemption 7(C).

We find no merit in this argument. The Sixth Hodes Declaration unambiguously states that "all possible 'tools' . . . were utilized in the processing of these documents in order to maximize disclosure to plaintiff." Sixth Hodes Decl. ¶ 13, Joint Appendix ("J.A.") 49-50. The references to employment of certain methods in the FBI's "administrative discretion" clearly indicate the Government's position that it *did* opt to apply the methods even though it was not legally required to do so. *See* Fifth Hodes Decl. ¶¶ 10, 13, J.A. 34-36; Sixth Hodes Decl. ¶ 14, J.A. 50. The Fifth Hodes Declaration's statement that the methods were used "where possible" is similarly clear when read in context. *See* Fifth Hodes Decl. ¶ 10, J.A. 34. The Government took the position that it was only possible: (1) to apply the 100-year rule where the individual's birth date appeared in the responsive pages, *see id.* ¶ 11, J.A. 35; (2) to rely on a search of the SSDI where the individual's social security number appeared in the responsive documents, *see id.* ¶ 13, J.A. 35-36; and (3) to rely upon institutional knowledge of the death of certain individuals from past FOIA requests where such knowledge existed. *See id.* ¶ 12, J.A. 35. We address the reasonableness of the Government's methods below, but as a preliminary matter we find that the Hodes Declarations adequately support the Government's assertion that the methods were affirmatively and consistently applied to all of the information withheld.

### 3. *Name-Based Searching of the SSDI*

We concur with the District Court's conclusion that a researcher must have the target's social security number in order positively to verify that the individual appearing in the SSDI is the same individual referred to in a responsive document. *See Schrecker*, 217 F. Supp. 2d at 38. The possibility of multiple matches for a single name necessitates a ready and conclusive means of verifying that the individual in the database and the individual in the FOIA record are one and the same. *See* Sixth Hodes Decl. ¶ 16, J.A. 51-52; Reply Br. Addendum 1 (showing 13 separate results from a name-based search of the SSDI for Joseph Fischetti, the subject of another of Schrecker's FOIA requests). The fact that a name-based search of the SSDI may reveal other identifying information, such as the date and place of an individual's birth, does not obviate or diminish this need for ready verification.

As noted above, the Government only searched the SSDI where the social security number of the individual in question appeared in the responsive pages. *See* Fifth Hodes Decl. ¶ 13, J.A. 35-36; Sixth Hodes Decl. ¶ ¶ 15-16, J.A. 51-52. The Government specifically declined to go beyond the responsive documents to investigate the individuals' social security numbers, a policy it justified on two grounds: (1) that such research would violate these third parties' privacy rights; and (2) that it would be unduly burdensome. *Id.*

We find the first of these justifications unpersuasive. The Sixth Hodes Declaration states only that "[t]he records that may possess these individuals' Social Security numbers were created either for law enforcement purposes *or internal administrative personnel purposes*; they were not created for the purpose of ascertaining whether individuals contained in these records are alive or deceased for purposes of FOIA requests." Sixth Hodes Decl. ¶ 16, J.A. 52 (emphasis in original). We fail to see how the purpose for which an internal record was created bears on whether searching the record for an individual's social security number would violate that individual's privacy. If searching responsive documents

(created for law enforcement purposes) for social security numbers is not barred by privacy concerns, it is unclear how searching other internal documents would be. The Government offers no further support for this "privacy" justification nor can we discern any.

We nevertheless hold that it would be unduly burdensome to require the Government to research nonresponsive records for the relevant individuals' social security numbers. We have held that there are limits to the lengths to which an agency must go in responding to a FOIA request. *See Nation Magazine*, 71 F.3d at 891-92; *Am. Fed'n of Gov't Employees, Local 2782 v. United States Dep't of Commerce*, 907 F.2d 203, 208-09 (D.C. Cir. 1990). The same principle applies here. The record before us does not indicate whether it would be possible to conduct an automated search of any internal FBI files that might contain the social security numbers of individuals whose names appear in responsive documents of this vintage, or whether a physical search would be necessary. Even if an automated search were possible, any name-based search would likely encounter the same obstacle posed by the SSDI: duplication of names making verification difficult or impossible. The difficulties implicit in such a search would be multiplied by the number of names withheld. In this case, 113 such names appeared in the 100-page *Vaughn* index alone, and the responsive documents totaled over 24,000 pages. To require the Government to shoulder such a potentially onerous task – with dubious prospects of success – goes well beyond the "reasonable effort" demanded in this context.

Our position is unaffected by Schrecker's reference to the example of Joseph Fischetti, the subject of another of her FOIA requests. Schrecker asserts that the FBI accepted a printout of the results of an SSDI search, showing 13 separate hits, as proof of Fischetti's death, and that the FBI began processing his records on this basis. *See* Reply Br. Addendum 1. As the District Court noted, however, Fischetti was the *sole subject* of that FOIA request, not one of a *multitude of third parties* appearing in responsive documents. *See Schrecker*, 217 F. Supp. 2d at 38. While it may be

reasonable to pursue internal research to determine whether a single subject is the same individual shown by the SSDI to be deceased, we conclude that it would be unduly burdensome to require the Government do so for the large number of third parties appearing in documents responsive to Schrecker's request.

4. *The 100-Year Rule*

Schrecker posits three distinct challenges to the Government's 100-year rule, but fails to establish that the rule is unreasonable or to propose a viable alternative. Schrecker first argues that the rule is doomed as an effective tool because it is only invoked where the responsive records contain the individual's birth date, which is rare. *See* Fifth Hodes Decl. Ex. A, J.A. 39-46 (showing birth dates for only three of the 113 individuals appearing in the *Vaughn* index). While Schrecker proposes no alternative means of ascertaining the birth dates of the individuals in the records, we note that requiring the Government to search beyond the responsive records for such information would impose an unreasonable burden similar to that required to search for an individual's social security number.

Second, Schrecker argues that 100 years is an unreasonably long time period upon which to base the rule. She argues that current average life expectancy for both sexes is less than 80 years, and that average life expectancy was lower for the individuals appearing in the responsive records, all of whom were adults in the late 1940s and early 1950s. Amici flesh out this argument with numerical estimates derived from actuarial tables compiled by the Social Security Administration. They assert that the median life expectancy for males who were 30 and 40 years old in 1950 is about 74 years, and the median life expectancy for females who were 30 and 40 years old in 1950 is about 82 years. Br. for Amici at 9 (citing FELICITIE C. BELL & MICHAEL L. MILLER, LIFE TABLES FOR THE UNITED STATES SOCIAL SECURITY AREA 1900-2100 (Social Security Administration Actuarial Study No. 116, Aug. 2002) (Table 7, Cohort Life Tables for U.S. Social Security Area by Year of Birth and Sex) (hereinafter "SSA Actuarial Study")).

Amici further contend that the chance that a male who was 30 in 1950 would live to be 100 is only 0.01%, while the chance that a female who was 30 in 1950 would do so is only 2%. Br. for Amici at 16 (calculations derived from SSA Actuarial Study).

We find that the Government's use of 100 years as the basis for the rule nonetheless is reasonable. This baseline is intended to prevent disclosure of personal information unless it is *highly probable* that the individual in question is dead. Amici's statistics, if correct, confirm that the rule is properly tailored to this purpose. The likelihood that living individuals' personal information would be disclosed presumably would increase proportionately with any reduction in the time frame upon which the rule is based. While the 100-year rule is more protective of personal privacy than Schrecker would prefer, it is not unreasonable.

Third and finally, Schrecker asserts that, in the absence of a birth date, the Government improperly presumes that individuals mentioned in records of this vintage are alive. Amici provide statistical support, asserting that there is a 28% chance that a man who was 30 in 1950 is alive today, and a 4% chance that a man who was 40 in 1950 is still alive. Br. for Amici at 8 (citing SSA Actuarial Study). There is a somewhat greater likelihood that an adult woman of that era is still alive: 47% for a woman who was 30 in 1950, and 13% for a woman who was 40 in 1950. *Id.*

We again find reasonable the Government's prophylactic presumption that the individuals whose names appear in these records are alive. It may be more likely than not that any given individual named in these records is dead. But Amici's own statistics, if correct, indicate that there remains a substantial probability that a given individual is alive: about one in two or greater for women who were 30 or younger in 1950, and about one in four or greater for men who were 30 or younger in 1950. Again, the Government's rebuttable presumption that an individual is alive is more protective of personal privacy than Schrecker would like, but it is not unreasonable.

*5. Balancing of Privacy and Public Interests*

Having determined that the Government has satisfied its duty to investigate whether the relevant individuals are living or dead, we now affirm the District Court's finding that the Government appropriately balanced public and privacy interests in withholding personal information under Exemption 7(C).

Our precedents give strong support to Government decisions to withhold names and identifying information from law enforcement records. *See, e.g.*, *Safecard Servs.*, 926 F.2d at 1206; *Fitzgibbon*, 911 F.2d at 767-68; *Keys*, 830 F.2d at 347-48; *King*, 830 F.2d at 234-35; *Senate of the Commonwealth of Puerto Rico*, 823 F.2d at 588; *Bast*, 665 F.2d at 1254-55; *Lesar*, 636 F.2d at 487-88. Assuming that the "private" individuals mentioned in the records are living, their names and identifying information are presumptively exempt from disclosure under the *Safecard* rule. *See Safecard Servs.*, 926 F.2d at 1206 (holding that information in law enforcement records identifying private individuals is exempt from disclosure unless release is necessary to "confirm or refute compelling evidence that the agency is engaged in illegal activity"); *Nation Magazine*, 71 F.3d at 896 (reaffirming *Safecard* rule).

We have long recognized, moreover, that "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *See Fitzgibbon*, 911 F.2d at 767 (internal quotation marks and citation omitted). Therefore, persons involved in law enforcement investigations – witnesses, informants, and the investigating agents – "have a substantial interest in seeing that their participation remains secret." *Senate of the Commonwealth of Puerto Rico*, 823 F.2d at 588. Where, as here, there is a reasonable possibility that the individuals in question are alive, their privacy interests remain strong. The passage of time, without more, does not materially diminish these interests. *See Keys*, 830 F.2d at 348 (finding that passage of 40 years did "not so dilute the privacy interest as to tip the balance the other way"); *King*, 830 F.2d at 234

(upholding nondisclosure of identifying information from 30- to 40-year-old records).

The countervailing public interest in disclosure of the names and other identifying information of those appearing in the responsive documents is weak. Schrecker asserts that disclosure of this information would shed light on the workings of government by permitting closer public scrutiny of the Eisler and Jencks investigations. But "[w]e have rejected similar claims in the past because the type of information sought is simply not very probative of an agency's behavior or performance." *Safecard Servs.*, 926 F.2d at 1205. Whatever the incremental value of disclosure of the names in the Eisler and Jencks records, it does not outweigh the relevant individuals' clear and significant privacy interest in nondisclosure of their personal information. *See, e.g.*, *Bast*, 665 F.2d at 1255 (finding that the putative value of releasing redacted information did not outweigh the invasion of personal privacy). The Government therefore was justified in withholding this information under Exemption 7(C).

## III. CONCLUSION

For the reasons set forth above, we affirm the District Court's decision granting summary judgment to the Government.