BROWN, Circuit Judge,
dissenting:
While I sympathize with the court’s protective instincts, I subscribe to Lady Macbeth’s drear insight: “What’s done cannot be undone.” Redemption is still possible, but in the modern world, the right to be left alone, once forfeited, is gone for good. An individual who is indicted and tried has no privacy interest that can protect the public record of prosecution from disclosure — even if the ultimate outcome was acquittal or dismissal. The residual priva *940 cy concerns we identified in ACLU I are insufficient to meet the Exemption 7(C) threshold. There we noted that the privacy right at common law rested in large part on the “degree of dissemination,” and that “interests in privacy fade ” when the information is already part of the public record and is readily available. Am. Civil Liberties Union v. U.S. Dep’t of Justice (ACLU I), 655 F.3d 1, 9 (D.C.Cir.2011). Because the privacy interest here started small and the pace of technology continues to diminish it, I respectfully dissent.
At the outset, I should note the court does get one thing right. As a general matter, judges tasked with balancing equally metaphysical concepts, like privacy and the public interest, face what are among the most difficult and largely standardless endeavors. See Reporters Comm. for Freedom of Press v. U.S. Dep’t of Justice, 816 F.2d 730, 741 (D.C.Cir.1987) (expressing doubt that there is any principled basis for federal judges to make such ad hoc and idiosyncratic determinations). Even so, I agree the balancing in this case is relatively clear. The six disputed records already exist in the public domain. Indeed, the court acknowledges the records are accessible via a simple Google search or through PACER. Furthermore, the court correctly determines the public interest in disclosure is no more or less than it was in ACLU I. There, we characterized the public interest as “significant.” ACLU I, 655 F.3d at 12. With one arm of the balance thus weighted, the only question is whether the privacy interests of unconvicted persons tip the scales against disclosure. The court today holds that the contest, while close, is nevertheless convincingly won by a supposedly more substantial privacy interest. I am not persuaded. On balance, the permanence and accessibility of the records render any privacy interests only marginally greater than they were in ACLU I, thus tipping the balance in favor of disclosure.
The majority’s privacy analysis rests on two pillars: the presumption of innocence and the common law of informational privacy. Both notions have shortcomings. First, the presumption of innocence is an artifact of the common law’s adversarial approach to the question of guilt. What authority exists for the proposition that the presumption of innocence affords indicted, but unconvicted, persons some measure of informational privacy? The Supreme Court has made it clear that the presumption of innocence applies only to a criminal trial and, within the trial, only to the jury or other trier of fact. See Bell v. Wolfish, 441 U.S. 520, 533, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (“The presumption of innocence is a doctrine that allocates the burden of proof in criminal trials; it also may serve as an admonishment to the jury to judge an accused’s guilt or innocence solely on the evidence adduced at trial.... ” (emphasis added)). Any other, extra-trial reference to the doctrine is both imprecise and impotent. If, as the Supreme Court posits, the presumption of innocence is purely an instrument for allocating the burden of proof at trial and warning jurors against drawing untoward inferences, then there is no basis for supposing the presumption of innocence governs events beyond the trial itself. Contra Majority Op. at 933 (“Individuals who are charged with a crime and ultimately prevail of course remain entitled to a version of this presumption [of innocence].”). And why would a common law presumption trump FOIA’s statutory mandate?
The court hypothesizes the plight of individuals who, though never convicted, are viewed with suspicion when others learn of their mere involvement in particularly ignoble eases. See Majority Op. at 934-35. But even if true, persons who are publicly indicted and tried can have no reasonable expectation that the occurrence of these events will not be publicly dis *941 closed. Risk of disclosure inheres in the very nature of these public proceedings. See Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947) (“A trial is a public event. What transpires in the court room is public property.”). To be sure, we previously discounted the small but nonetheless real risk of renewed attention, dismissing such concerns as sheer “speculation.” See ACLU I, 655 F.3d at 10-11 (“Such a list [of publicly indicted persons] is surely less likely to draw attention to a name than was the initial press coverage of an indictment....”).
Furthermore, what of the need for an informed citizenry to hold public officials accountable? One “purpose of FOIA is to permit the public to decide for itself whether government action is proper.” Wash. Post Co. v. U.S. Dep’t of Health & Human Servs., 690 F.2d 252, 264 (D.C.Cir.1982) (emphasis added); see also Richard A. Epstein, Privacy, Publication, and the First Amendment: The Dangers of First Amendment Exceptionalism, 52 Stan. L. Rev. 1003, 1004, 1047 (2000) (discussing as a counterweight to privacy goals, the social ideal of full disclosure of information about others to allow individuals to make “full and informed decisions on matters of great importance”); Sadiq Reza, Privacy and the Criminal Arrestee or Suspect: In Search of a Right, in Need of a Rule, 64 Md. L. Rev. 755, 807 (2005) (“The government should arguably inform the public about its suspicions regarding an arrestee or suspect so that people may practice ‘informed living,’ the right to exercise an informed choice about those with whom they live and associate. That is, X should have access to information that Y has been arrested for or suspected of a crime so that X can decide intelligently whether to socialize with Y, let her children play with Y’s children, patronize Y’s business, or use Y’s professional services, and so forth.”). From the point of view of the wrongfully accused, this will be a continuing injustice, but a person can be found not guilty and still not be innocent of the crime charged. See Rigsbee v. United States, 204 F.2d 70, 72-73 (D.C.Cir.1953) (holding- that an acquittal differs from innocence and that the former would be insufficient by itself to obtain a certificate signifying the latter). The rough balance courts must strike can never resolve such anomalies.
The Court’s reliance on common law informational privacy doctrine is similarly unavailing. “[B]oth the common law and the literal understandings of privacy encompass the individual’s control of [personal] information.” Reporters Comm., 489 U.S. at 763, 109 S.Ct. 1468. The touchstone of informational privacy — the right to be let alone — has long rested on the degree to which an allegedly private fact has been disseminated, and the extent to which the passage of time has rendered it private. Id. Nevertheless, technological advances seem to presage the death knell for this previously workable standard. In today’s echo chamber of big data, metadata, and the Internet, the once wholly forgotten memory of some unsavory, minimally broadcast misdeed is resurrected for global consumption. Against this backdrop, it seems fanciful to believe that individuals who were publicly indicted but never convicted (though in some cases publicly tried), retain an objective, substantial privacy interest in controlling information about these public facts.
The court says unconvicted persons are “entitled to move on with their lives without having the public reminded of their alleged but never proven transgressions.” Majority Op. at 933. Alas, Google, unlike God, neither forgets nor forgives.[1] Indeed, Google is not alone in its uncanny *942 ability to keep the proverbial score. It is true that most jurisdictions treat aggregations of data confidentially, but they also insist on transparency for records of individual cases. Courts, too, have a penchant for reminding acquitted individuals of their “alleged but never proven transgressions.” See, e.g., Dowling v. United States, 493 U.S. 342, 354, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (holding that admission of evidence relating to a crime the defendant had previously been acquitted of committing did not violate double jeopardy or due process); United States v. One Assortment of 89 Firearms, 465 U.S. 354, 356-66, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984) (holding that a gun owner’s acquittal on criminal charges involving firearms did not preclude a subsequent in rem forfeiture proceeding against those firearms under 18 U.S.C. § 924(d)); United States v. Foster, 19 F.3d 1452, 1455 (D.C.Cir.1994) (noting that virtually every circuit permits enhancement of sentence based on acquitted conduct).
The proposition that “an ‘ordinary citizen’ has a privacy interest ‘in the aspects of his or her criminal history that may have been wholly forgotten,’ ” Majority Op. at 934 (citing Reporters Committee, 489 U.S. at 769, 109 S.Ct. 1468), is thus inapt. Thanks to the Internet (for better or worse), information that was once scattered, localized, and forgotten with the passage of time is now effectively permanent and searchable. And though one might wish quietly to melt into the shadow of obscurity, the inexorable march of time is simply no match for the unflagging, unforgiving memory that is the World Wide Web. Once a secret is disclosed online, neither the courts nor society may unring the lingering echo of the bell. In this respect, Reporters Committee is an anachronism. The aspects of an “ordinary eitizen[’s]” criminal history the Court thought would be wholly forgotten were the data contained in rap sheets, which were maintained in a localized computer database. See Reporters Comm., 489 U.S. at 752, 771, 109 S.Ct. 1468; see also ACLU I, 655 F.3d at 8. Nowadays, bits and pieces of data are aggregated and immortalized on public and private systems, and the private systems have no purge schedules.
This is not to say the modern man has abdicated any expectation of privacy in facts partially disclosed. As the Supreme Court observed, “the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information.” Reporters Comm., 489 U.S. at 770, 109 S.Ct. 1468. But there is a vast chasm between facts disclosed to a discrete group that otherwise treats the information as private and facts that are unqualifiedly revealed and accessible to virtually everyone. In my view, the case before us falls into the latter camp. Cf. id. at 752, 109 S.Ct. 1468 (“As a matter of executive policy, [DOJ] has generally treated rap sheets as confidential and, with certain exceptions, has restricted their use to governmental purposes.”); Dep’t of Air Force v. Rose, 425 U.S. 352, 359-60, 96 S.Ct. 1592, 48 L.Ed.2d 11 (noting that the Academy treated “all matters discussed” at hearings for honor code violations as “confidential,” marked case summaries “for official use only,” and instructed cadets “not to read the case summary unless they have a need, beyond mere curiosity, to know their contents”).
Considering the fissures in the two pillars supporting the court’s privacy analysis, one would expect the privacy interests to become less significant. At the very *943 least, these serious deficits ought give way to the court’s obligation to “make a reasonable effort to account for the death of a person on whose behalf the [agency] invokes Exemption 7(C).” Schrecker v. U.S. Dep’t of Justice, 349 F.3d 657, 662 (D.C.Cir.2003). This would include the deaths of family members. After all, “death clearly matters, as the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living.” Campbell v. U.S. Dep’t of Justice, 164 F.3d 20, 33 (D.C.Cir.1998). I am not swayed by the majority’s contention that reputational interests are enough to carry the day. The posthumous reputational interest the Supreme Court recognized in Swidler & Berlin v. United States, 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998), is the one rooted in the venerable attorney-client privilege, not informational privacy. See id. (holding that the attorney-client privilege survives a client’s death).
One last point warrants discussion. Judge Tatel’s concurrence seeks to lend credence to DOJ’s invocation of the incremental value test — a test allegedly of precedential value. I am not so certain. First, the test is of dubious provenance. In King v. U.S. Dep’t of Justice, 830 F.2d 210, 234 (D.C.Cir.1987), the case cited by Schrecker as authority for its statement about the incremental value test, the court never actually used the words “incremental value.” Instead, the court merely held that, because the appellant failed to demonstrate how disclosing the redacted names was relevant to the public interest, the privacy interests “outweighed any public interest attending disclosure.” See id. at 234-35. That is all. King did not hold that the incremental value of information depends on the mix of data already publicly available.
In the 200-plus FOIA cases since the Schrecker decision, we have referenced the incremental value test only three times. In each instance, we have understood it to mean exactly the opposite of what the concurrence posits: “even if the ‘absolute value’ of the requested information is small, it must nevertheless be released if it adds any incremental value of public interest.” Appellants’ Reply Br. at 15; see ACLU I, 655 F.3d at 15 (rejecting DOJ’s “incremental contribution” argument because “[t]he fact that the public already has some information does not mean that more will not advance the public interest” (emphasis added)); Lardner v. U.S. Dep’t of Justice, 398 Fed.Appx. 609, 611 (D.C.Cir.2010) (affirming the district court’s decision to disclose the identities of denied pardon and commutation applicants despite the previous disclosure and existence of approved applicants’ identities on the public record. ■ Significantly, the court noted: “The incremental value of the withheld information is not speculative....”); Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep’t of Health & Human Servs., 554 F.3d 1046, 1060 (D.C.Cir.2009) (Rogers, J., concurring in part and dissenting in part) (“[E]ven though the requested data will only partially reveal physicians’ experience levels, the data has ‘incremental value’ for ascertaining the quality of services performed.”).
In any event, even assuming the court is bound by the version of the incremental value test Judge Tatel espouses, the cases cited in support of this test are all distinguishable for one reason or another. In Ray, for example, the privacy interests were more significant than those implicated here. The information redacted from the disputed records was obtained via interviews with requested Haitians who were promised confidentiality. U.S. Dep’t of State v. Ray, 502 U.S. 164, 172, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). In other words, the parties agreed to treat the information obtained as private. Fur *944 thermore, the Court’s conclusion that “[t]he addition of the redacted identifying information would not shed any additional light on the Government’s conduct of its obligation,” id. at 178, 112 S.Ct. 541 (emphasis added), is in accord with this court’s prior application of the test. The redacted information was withheld precisely because the Court recognized that, “in and of itself’ it would not “tell respondents anything about Haiti’s treatment of the returnees or this Government’s honesty.” Id. at 170-71, 112 S.Ct. 541 (emphasis added).
Perhaps most importantly, however, Ray involved redacted information, not wholly undisclosed records. The difference is not merely academic. Judge Ta-tel’s version of the incremental value test would make little sense where, as here, a court is dealing with undisclosed records that are substantively dissimilar to records previously disclosed. Unlike Ray, where the redacted information was sought so that interviews with Haitians could be conducted anew, 502 U.S. at 178-79, 112 S.Ct. 541, disclosing the records of unconvicted persons would be neither duplicative nor speculative. It is reasonable to believe the six files could contain new information precisely because the records sought — unlike the Haitian interviewees — are qualitatively different. In fact, Judge Tatel agrees. Concurring Op. at 938-39 (“The disclosure of these six cases could also shed at least some additional light on the scope and effectiveness of [warrantless cell phone tracking].”). Nothing more is required.
At bottom, the public interest in disclosure remains as robust as it was in ACLU I. Conversely, in the Internet age, privacy is no longer what it once was. Times have changed, and so, too, must our expectations. I respectfully dissent.

. There are exceptions, of course, but records memorializing a public indictment and trial *942 do not appear to be one of them. See Removal Policies, Google, https://support.google. com/websearch/answer/ 2744324#offensiveimages (last visited Apr. 23, 2014).