# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 12, 2021       Decided June 3, 2022

No. 20-5139

JIHAD IBN BARNES,
APPELLANT

v.

FEDERAL BUREAU OF INVESTIGATION,
APPELLEE

Consolidated with 20-5167

Appeals from the United States District Court
for the District of Columbia
(No. 1:16-cv-00205)

*Evan D. Miller* argued the cause for appellant. With him on the briefs was *Joshua S. Johnson*.

*Diana Valdivia*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief was *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: SRINIVASAN, *Chief Judge*, KATSAS, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:  This appeal turns on when a criminal defendant, as part of a plea agreement, may waive the right under the Freedom of Information Act to seek government records related to his case.  In *Price v. U.S. Department of Justice Attorney Office*, 865 F.3d 676 (D.C. Cir. 2017), we held that such waivers must serve a legitimate criminal-justice interest to be enforceable.  In this case, we hold that the waiver at issue is enforceable because it advances an interest in protecting the safety of a confidential informant.  We further hold that the waiver extends to all the disputed records.

I

Upon receiving information that appellant Jihad Barnes posed a threat to national security, the Federal Bureau of Investigation opened a terrorism investigation against him. During the investigation, Barnes proposed to a confidential informant that they rob and possibly murder a diamond dealer in Northern Virginia.  After Barnes provided two loaded semiautomatic handguns for use in the robbery, the FBI arrested him.  At that time, Barnes had already been convicted of manslaughter and two armed robberies.  A grand jury charged him with possessing a firearm as a felon.

While in pretrial detention, Barnes orchestrated a plot to prevent the informant from testifying against him.  According to the government, Barnes told Rasheda Savoy, his common-law wife, that an informant was responsible for his arrest. Through Savoy and other associates, Barnes sought to persuade or coerce the informant to testify falsely at his trial.  At

Barnes's direction, Savoy used an online tracing service to connect the informant's phone number to a name and city. On Facebook, she also discovered that the informant had a son and daughter. Barnes and Savoy planned to obtain the informant's home address by reaching out to his family through a fraudulent Facebook account. Savoy showed Barnes a photograph of the person she had identified. After Barnes confirmed that this individual was the informant, they asked various confederates to hunt him down. The FBI uncovered the plot before Barnes learned of his address.

A grand jury issued a superseding indictment against Barnes, which set forth these allegations and added charges for conspiracy to commit witness tampering and attempt to obstruct an official proceeding. The government produced extensive discovery to Barnes, including over 200 pages of redacted FBI reports, cell-phone subscriber records, and audio recordings from meetings between Barnes and the informant.

Barnes eventually pleaded guilty to the felon-in-possession count, and the government agreed to drop the tampering and obstruction charges. As part of the plea deal, Barnes waived all rights "to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act." J.A. 542–43. For her part, Savoy pleaded guilty to conspiring with Barnes to tamper with a witness, and she signed a statement admitting the government's various allegations about her plot with Barnes to intimidate or threaten the informant.

In 2015, Barnes filed a FOIA request for all FBI records containing his name, as well as FBI records containing

4

allegations of terrorism by him or by a particular mosque. The FBI declined to provide the requested documents.

Barnes sued, and the FBI moved for summary judgment based on the waiver in Barnes's plea bargain. The district court granted the motion as to documents relating to the terrorism investigation into Barnes. The court concluded that the waiver was enforceable because it served the government's legitimate interest in protecting the informant. After Barnes voluntarily dismissed his claims for the other documents, the district court closed the case. Barnes appealed, and we have jurisdiction under 28 U.S.C. § 1291.

II

In FOIA cases, we review *de novo* summary judgments for the government. *Schrecker v. DOJ*, 349 F.3d 657, 661–62 (D.C. Cir. 2003). We also interpret the terms of a plea agreement *de novo*. *United States v. Moreno-Membache*, 995 F.3d 249, 254 (D.C. Cir. 2021).

A

As a general matter, plea bargains may waive the "most basic rights of criminal defendants," including a wide range of Fourth, Fifth, and Sixth Amendment rights. *Peretz v. United States*, 501 U.S. 923, 936 (1991); *see United States v. Ruiz*, 536 U.S. 622, 629–30 (2002). Likewise, statutory rights are waivable absent some affirmative indication to the contrary. *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995). Despite these background principles, and despite FOIA's silence about waiver, *Price* took a more exacting approach to plea bargains that waive a defendant's right to seek records related to his case. In FOIA, we perceived a "public policy" to facilitate the disclosure of exculpatory evidence and the development of ineffective-assistance claims. 865 F.3d at 682–

83. We therefore held that plea-bargain waivers of a FOIA right to seek records about the case must advance a "legitimate criminal-justice interest" to be enforceable. *Id.* at 681. On *Price*'s facts, we found this standard not met because the government had failed to identify any such interest served by the waiver at issue. *Id.* at 678. Instead, the government had merely asserted an interest in "efficient and effective prosecution," but failed to explain how a FOIA waiver served that interest. *Id.* at 681–82. The government further asserted an interest in avoiding FOIA litigation by prisoners with "a lot of time on their hands," but we found that argument unpreserved. *Id.* at 682.

In this case, the FBI asserts an interest in protecting the life and safety of its confidential informant. That is obviously a legitimate criminal-justice interest. FOIA itself recognizes the importance of protecting informants, in exempting from disclosure records that "could reasonably be expected to disclose the identity of a confidential source," 5 U.S.C. § 552(b)(7)(D), or "could reasonably be expected to endanger the life or physical safety of any individual," *id.* § 552(b)(7)(F). The Witness Security Reform Act of 1984 requires the Justice Department to protect potential witnesses and their families, such as by helping them establish a new identity, find housing and employment, and meet basic living needs. 18 U.S.C. § 3521(b). Likewise, the Department's prosecution manual states that "[t]he safety/security of an informant assisting in an investigation is the responsibility of the investigative agency utilizing the informant." U.S. Dep't of Justice, Justice Manual, § 9-21.110 (2018), https://www.justice.gov/jm/jm-9-21000-witness-security. And in many contexts, the Supreme Court has recognized the importance of protecting informants. *See, e.g.*, *CIA v. Sims*, 471 U.S. 159, 172 (1985) (intelligence informants will "close up like a clam" unless government can protect their identities (cleaned up)); *Roviaro v. United States*,

353 U.S. 53, 59 (1957) (recognizing "Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law").

The FOIA waiver in Barnes's plea agreement furthers the government's interest in witness security, so it is enforceable. Before the FBI even began its investigation, Barnes had served long sentences for manslaughter and two armed robberies. In preparing for another robbery, he procured semiautomatic weapons and contemplated killing or harming the intended victim. The government also reasonably feared that Barnes posed a threat to the informant, as reflected in Barnes's superseding indictment and Savoy's admissions. Specifically, the government believed that Barnes, based on only a phone number, had used online resources to discover the name of the informant, a photograph of him, and the identity of his family members. It believed that Barnes wished to "confront" the informant to secure perjured testimony. J.A. 334. And it believed he was able to accomplish all of this from prison. In short, the government had good reason to insist on a FOIA waiver to make it harder for Barnes to learn more sensitive information about the informant.

Despite all of this, Barnes responds that the waiver was unnecessary because FOIA itself already protects informants. Barnes invokes Exemptions 7(D) and 7(F), which permit the government to withhold documents if their release "could reasonably be expected to disclose the identity of a confidential source" or "to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(D), (F). But FOIA processors are hardly infallible in determining whether these provisions apply to specific records. Moreover, Barnes himself has unique knowledge about the informant from their interactions, which Barnes augmented through criminal

discovery and the tampering conspiracy. For these reasons, the FBI could worry that disclosing some nugget of information might not seem to put its informant at greater risk, but that Barnes nonetheless could exploit the information for that purpose. And given that concern, the FBI had a legitimate interest in seeking a waiver despite the protection afforded by the exemptions.

The FBI documented its concerns in this case. A section chief in its Information Management Division noted that release of information provided by informants often may reveal their identities. J.A. 384. An attorney involved in Barnes's prosecution explained that Barnes's "intimate knowledge of his own conduct" makes him "uniquely positioned" to deduce from any released records the location of the informant, and that FOIA staff, "who necessarily do not share Barnes' personal knowledge of the circumstances giving rise to the prosecution," could not be expected to spot all potentially revealing information. J.A. 336. The Bureau provided at least one example where an inmate with a history of witness intimidation managed to piece together facially innocuous information provided under FOIA to determine an informant's identity. *See United States v. White*, No. 08-cr-0054 (W.D. Va. Oct. 5, 2020), ECF No. 411-1. And it noted that, over a recent three-year period, close to 700 government witnesses and informants have been threatened, while over 60 have been murdered. Gershman, *Why Life for 'Snitches' Has Never Been More Dangerous*, Wall St. J. (June 20, 2017). For these reasons, we conclude that the FOIA waiver advances the government's legitimate interest in protecting an informant.

Barnes further responds that we must weigh that interest against the harms of enforcing the waiver. He objects that the waiver disables him from gathering hypothetical evidence of law-enforcement misconduct. We are hard-pressed to imagine

what that might be, given the vague and unsupported nature of Barnes's misconduct allegations. In any event, although *Price* recognized the reduced ability to gather evidence as a harm, we declined to enforce a FOIA waiver only because the government had "failed to identify *any* legitimate criminal-justice interest served by the waiver." 865 F.3d at 678 (emphasis added); *see also id.* at 681 ("the government has not pointed us to any legitimate criminal-justice interest served by allowing for FOIA waivers in plea agreements"). Here, by contrast, the FBI has explained that this waiver advances its interest in protecting the safety of a confidential informant. Nothing more is required for us to enforce it.[1]

B

Barnes finally contends that the waiver does not cover all the records that he requested. In his plea agreement, Barnes waived the right to make a FOIA request for "any records pertaining to the investigation or prosecution of this case." J.A. 542–43. In Barnes's view, this waiver covers only documents that pertain to the firearms, tampering, and obstruction charges ultimately filed against him. And since the government never filed any terrorism charges, Barnes believes that the waiver does not apply to the FBI's terrorism investigation into him.

We disagree. By its terms, the waiver covers all records pertaining to the FBI's "investigation" of the "case" against Barnes. The terrorism investigation was part of this investigation because it culminated in the charges filed against Barnes. The investigation began as one focused on terrorism,

---

[1] Given our disposition, we need not consider the FBI's additional argument that the waiver is enforceable because it furthers efficient prosecutions and protects information about how the FBI conducts investigations into national security.

9

but it developed into a firearms case when the FBI arrested Barnes for possessing two loaded handguns. The investigation further developed into a tampering and obstruction case when Barnes, while detained on the firearms charge, sought to prevent an informant from testifying against him. During this time, the FBI viewed itself as conducting "one coherent investigation" against Barnes, so it organized all its records about Barnes into "a single investigatory file." J.A. 385. Because the investigation of the case against Barnes encompassed the terrorism investigation, the FOIA waiver covers records relating to it.[2]

III

The district court correctly granted summary judgment to the FBI.

*Affirmed.*

---

[2] The parties dispute whether Virginia contract law or general principles of contract law govern the interpretation of the plea agreement. We need not decide that issue because both bodies of law would instruct us to begin with the plain text of the agreement, which is decisive in this case. *Compare PMA Capital Ins. Co. v. US Airways, Inc.*, 626 S.E.2d 369, 372 (Va. 2006), *with Moreno-Membache*, 995 F.3d at 257.