In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 14-3733

DAVID RUBMAN,

*Plaintiff-Appellant,*

*v.*

UNITED STATES CITIZENSHIP &
IMMIGRATION SERVICES and
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 5129 — **Charles P. Kocoras**, *Judge.*

———————

ARGUED APRIL 23, 2015 — DECIDED AUGUST 31, 2015

———————

Before BAUER and SYKES, *Circuit Judges*, and REAGAN,
*Chief District Judge.*[*]

———————

[*] Of the Southern District of Illinois, sitting by designation.

SYKES, *Circuit Judge*. H-1B visas allow U.S. companies to hire noncitizen workers with specialized skills. The United States Citizenship and Immigration Services ("CIS"), an agency within the Department of Homeland Security ("DHS"), is responsible for their issuance. David Rubman sent CIS a request under the Freedom of Information Act ("FOIA") seeking "copies of all documents reflecting statistics … about H-1B visa applications" from the last four years. CIS responded with a single document: a data table that the agency had created to respond to his request. Rubman doubted the table's accuracy and insisted that CIS provide the documents he originally asked for: "'**ALL** documents reflecting statistics'" about H-1B visa applications, including internal statistical reports and e-mails. CIS refused, insisting that additional records would not be helpful and would "only create additional confusion." Rubman sued, challenging the adequacy of the search that CIS performed in response to his FOIA request. The district court granted summary judgment in favor of the agency.

We reverse. An adequate search is one that was both performed in good faith and reasonably designed to uncover the requested records. CIS failed to conduct an adequate search as required by law when it unilaterally narrowed Rubman's request for "all documents" to a single, newly generated statistical table.

## I. Background

### A. The H-1B Visa Program

The H-1B visa is a temporary, nonimmigrant visa for workers in "specialty occupations," defined as those that

typically require at least a bachelor's degree in a specific field of study. *See* 8 U.S.C. § 1184(i). Visa holders are able to work in the U.S. for three years (extendable to six), after which they must apply for a different visa or return to their home country (there's no path to citizenship). By statute the number of H-1B visas that can be issued per fiscal year is capped at 65,000. *See id.* § 1184(g)(1)(A)(vii). An additional 20,000 H-1B visas are available for workers with postgraduate degrees from American universities, and visas awarded to governmental, nonprofit, and educational research entities are not counted toward either limit. *See id.* § 1184(g)(5)(A)–(C). Visa petitions are submitted by U.S. employers on behalf of the noncitizen workers they want to hire, and the employers must demonstrate that the visa recipients will enjoy the same working conditions and wages as comparable domestic employees. *See id.* § 1182(n)(1)(A). The H-1B visa program is controversial, and recent proposals to raise the cap have been hotly contested. *See, e.g.*, Tim Henderson, *States, Cities Call for Skilled Foreign Workers Amid Abuse Claims*, THE PEW CHARITABLE TRUSTS: STATELINE (June 8, 2015), http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2015/6/08/states-cities-call-for-skilled-foreign-workers-amid-abuse-claims.

The process by which CIS administers the H-1B visa program is outlined in 8 C.F.R. § 214.2(h)(8)(ii)(B). In short, the agency projects how many petitions it must process to issue a full complement of visas, taking into account historical rates of denials, withdrawals, and revocations. Employers submit petitions starting on April 1 of each year, and the filing period is closed once CIS receives its target number (which often takes just a few days). If the agency receives more petitions than it projects it will need, a lottery is con-

ducted; selected petitions are issued a receipt number while the others are rejected and returned, along with their filing fees. The receipted petitions are then processed and visas awarded. Recipients can start work on October 1.

## B. Rubman's FOIA Request

David Rubman is a retired immigration attorney and former adjunct law professor at Northwestern University. On May 10, 2012, he submitted a FOIA request to CIS for the following:

> [C]opies of all documents reflecting statistics (specified below) about H-1B visa applications that were assigned a receipt number for [fiscal years 2009, 2010, 2011, and 2012].
>
> The requested statistics for each of the requested years are:
>
> (a) Number of H-1B visa applications for cap-subject initial employment;
>
> (b) Number of **approved** H-1B visa applications … ;
>
> (c) Number of **denied** H-1B visa applications … ;
>
> (d) Number of **withdrawn** H-1B visa applications … .
>
> … .
>
> I am seeking documents which will show whether [CIS] is complying with the statutory mandate … to issue no more than 65,000 cap-

> subject H-1B visas in each of the listed fiscal years.

Rubman closed his FOIA request by saying, "If you have any question about what documents I am seeking, please contact me so that we can both be on the same page about what I am asking for."

CIS replied by letter on September 17. The agency stated, "We have completed our search for records that are responsive to your request. The record consists of 4 pages of material and we have determined to release it in full." In substance, the agency's response consisted of a single statistical table purporting to show the data Rubman had requested. Beneath the table was a list of indecipherable database query "parameters" used to create the table. Also listed was the date the statistical table was generated: August 14, 2012, about three months after Rubman's FOIA request.

On October 1 Rubman wrote CIS, pointing out that the agency's table did not classify receipts by fiscal year as he'd requested; if it had, the total number of receipted petitions per year would equal the sum of the approvals, denials, and withdrawals for that year (i.e., every receipted petition would be accounted for). CIS responded by e-mail on October 12. The agency "sincerely apologize[d] for any inconvenience our original response may have caused" and attached a revised table.

Rubman wrote to CIS once more on October 22. He contended that the new table was "clearly inaccurate" and "cannot be reconciled" with either the first table CIS had provided or other publicly available data. For example, Rubman pointed out that the first table showed three-and-a-half times

as many denials as the second table. After explaining the apparent incongruities, Rubman concluded (and we quote him without alteration):

> In light of this serious discrepancy, I must insist that you provide me the documents I originally asked for: "**ALL** documents reflecting statistics … about H-1B visas that were assigned a receipt number for (2009, 2010, 2011 and 2012]." (emphasis added). I am sure there are, *inter alia*, weekly and monthly statistical reports as well as emails discussing the calculation of when the cap is reached.

Jill Eggleston, CIS's Director of FOIA Operations, responded on November 14 stating that the second table was "complete and accurate." She explained that CIS created the table because it had interpreted Rubman's initial request as one for statistics. Regarding his request for additional documents, Eggleston noted that "counting the cap is a very complex process." She continued:

> Internal emails discussing the calculation of when the cap will be reached would not provide you with an accurate calculation of H-1B cap filings for fiscal years 2009 to 2012, as they represent ongoing calculations and monitoring of cap filings until the cap closed each fiscal year. Additionally, they would not alter the outcome of the results that were provided to you on October 12, 2012, but rather only create additional confusion.

Eggleston closed by reviewing in detail the alleged statistical discrepancies. In short, CIS's position was that the "reports contain information based on different data points about different subsets of H-1B petitions," and "[a]s a result, the data cannot be compared."

Rubman filed an administrative appeal with CIS, which was denied because the agency considers a request that has been "granted in full" unappealable. As permitted by FOIA, Rubman then filed this suit in federal court.[1]

Settlement negotiations were tried and failed, and the case was submitted to the court on cross-motions for summary judgment. The judge observed that "the facts of the case at bar are unique in that the produced records mainly consisted of a Table that allegedly conveyed the information requested, as opposed to a disclosure of purely internal documents, which is more common in FOIA cases." The judge went on to hold, however, that Rubman's initial FOIA request was "non-specific and unwieldy" and therefore CIS's interpretation of the request as one for statistics was reasonable. The judge also concluded that Rubman's October 22 letter, which specifically requested internal reports and e-mails, was an impermissible "modification" of his original FOIA request to which CIS was not obliged to respond. The judge accordingly entered judgment for CIS, and Rubman appealed.

---

[1] A district court's jurisdiction over a FOIA suit arises under 5 U.S.C. § 552(a)(4)(B), which requires the court to "determine the matter de novo" (i.e., without deference to the agency's disclosure decision) and puts "the burden … on the agency to sustain its action." If the court finds that the agency has unlawfully withheld records, it can enjoin the agency from withholding them and order their production. *See id*.

## II. Discussion

### A. "Inadequate Search" FOIA Claims

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Toward that end, FOIA provides that agencies "shall make … records promptly available to any person" who submits a request that "(i) reasonably describes such records and (ii) is made in accordance with [the agency's] published rules." 5 U.S.C. § 552(a)(3)(A). The Act is "broadly conceived," and its "basic policy" is in favor of disclosure. *Robbins Tire*, 437 U.S. at 220. Agencies are, however, permitted to withhold records under nine statutory exemptions and three special exclusions for law-enforcement records. *See* 5 U.S.C. § 552(b)–(c).

The withholding of records pursuant to a statutory exemption is a frequent source of litigation. But Rubman brings a different kind of FOIA suit: He challenges the adequacy of CIS's records search. To prevail on summary judgment in this type of FOIA claim, the agency must show that there is no genuine issue of material fact about the adequacy of its records search. *See Becker v. IRS*, 34 F.3d 398, 405 (7th Cir. 1994); *Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994). To demonstrate that its search was adequate, "the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). In other words, the search must have been a good-faith effort and reasonable in light of the request. Good faith

is presumed, *see SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and it can be bolstered by evidence of the agency's efforts to satisfy the request. Reasonableness is a flexible and context-dependent standard. *See Davis v. DOJ*, 460 F.3d 92, 103 (D.C. Cir. 2006) ("[T]he adequacy of an agency's search is measured by a standard of reasonableness, and is dependent upon the circumstances of the case.") (internal quotation marks omitted).

Evidence that a search was reasonable and conducted in good faith generally comes in the form of "reasonably detailed nonconclusory affidavits submitted in good faith." *Matter of Wade*, 969 F.2d 241, 249 n.11 (7th Cir. 1992). The affidavit requirement is important because

> [a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.

*Oglesby*, 920 F.2d at 68.

In response to an agency affidavit, the FOIA requester can present "'countervailing evidence' as to the adequacy of the agency's search." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003). Once both parties have made their case, "if a review of the record raises substantial doubt [about the adequacy of the search], particularly in view of well defined requests and positive indications of

overlooked materials, summary judgment [in favor of the agency] is inappropriate." *Id*. (internal quotation marks omitted). If the court finds the agency's search inadequate, "the requester must show 'some reason to think that the document would have turned up if the agency had looked for it,'" though since neither the requester nor the court know the content of the agency's records, this is a low bar. *Patterson v. IRS*, 56 F.3d 832, 841 (7th Cir. 1995) (quoting *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). Importantly, the question at summary judgment is not whether the agency *might* have additional, unidentified responsive documents in its possession. *See Wade*, 969 F.2d at 249 n.11. Rather the court need only determine whether the search itself was performed reasonably and in good faith.

Rubman believes CIS's records search was inadequate because the agency never looked for the *type* of records he requested: He wanted a search of CIS's preexisting "documents reflecting statistics," while CIS interpreted his request as one for newly generated summary statistics. The district court held that CIS's interpretation of his FOIA request, and the resulting search, were reasonable. We turn now to the degree of deference we should give that conclusion.

## B. Standard of Review

Summary-judgment decisions are normally reviewed de novo. CIS argues that a more deferential standard would be appropriate, and it suggests that we borrow the two-tiered analysis used in FOIA exemption cases. But because appellate review of exemption cases implicates a unique set of

concerns that do not exist in an adequacy-of-the-search case, we conclude that de novo review is appropriate.

When summary judgment is granted to an agency that has withheld documents under one of FOIA's statutory exemptions, "the threshold inquiry in our review is to examine *de novo* the [agency's] declarations in 'considering whether the [district] court had an adequate factual basis for the decision rendered.'" *Patterson*, 56 F.3d at 836 (quoting *Becker*, 34 F.3d at 402) (second alteration in original). Whether the factual basis for a court's decision was adequate depends on factors such as the specificity of the agency's affidavit and the court's use of tools like in camera review and so-called *Vaughn* indexes. *See, e.g., id.*; *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1038 (7th Cir. 1998). If the factual basis was sufficient for the court to decide if the exemption applies, we review the court's conclusion only for clear error. *See Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1022 (7th Cir. 2012); *Enviro Tech Int'l, Inc. v. EPA*, 371 F.3d 370, 373 (7th Cir. 2004).[2]

We've explained that "the clearly erroneous standard [is] appropriate in light of the unique circumstances presented in FOIA exemption cases." *Solar Sources*, 142 F.3d at 1039 n.5. The use of a deferential standard of review in exemption cases has been justified because

> [t]he issue whether a document is exempt
> will often involve interpretation of the docu-

---

[2] There is no consensus among the circuits about the appropriate standard of review for FOIA exemption cases. *See* U.S. Dep't of Justice, GUIDE TO THE FOIA, Litigation Considerations, 130–33 (2013), http://www.justice.gov/oip/doj-guide-freedom-information-act-0.

> ment *vis-à-vis* the standards for exemption and in the light of the background of the matter. The opportunity of the requesting party to argue that issue is limited by the fact that he or she does not know the contents of the document withheld or its redacted portion … and he or she may not be familiar with some of the background facts. As a result, the real responsibility for appraisal of the issue is with the district court, and review by the appellate court is correspondingly limited.

*Becker*, 34 F.3d at 402 n.11. Concern for the conservation of judicial resources also looms large in exemption cases. District courts sometimes face "the monumental task of reviewing the denial of … FOIA request[s] comprising millions of pages of documents." *Solar Sources*, 142 F.3d at 1038. And so while we closely scrutinize whether a court had adequate information from which to determine if an exemption applies, we don't redo the entire review ourselves with the goal of reaching an independent (de novo) conclusion. *See Vaughn v. Rosen*, 484 F.2d 820, 825 (D.C. Cir. 1973) ("The scope of inquiry [in FOIA exemption cases] will not have been focused by the adverse parties and, if justice is to be done, the examination must be relatively comprehensive. Obviously an appellate court is even less suited to making this inquiry than is a trial court.").

The same considerations are not present in FOIA suits challenging the adequacy of an agency's records search. These disputes turn on the good faith and reasonableness of the search. The inquiry requires an interpretation of the agency's duties (under FOIA and related regulations) and

the record (including the FOIA request, subsequent correspondence between the agency and the requester, and affidavits). This kind of inquiry is manageable in scale, amenable to the adversarial process, and routinely subject to de novo appellate review. We conclude that summary judgment in a FOIA case challenging the adequacy of a search should be reviewed under the traditional de novo standard.[3]

## C. The Adequacy of CIS's Search

### 1. *The Response to Rubman's FOIA Request*

Rubman has not alleged bad faith by CIS. The agency proved responsive throughout the process, especially in its quick creation of the second data table. *See Meeropol v. Meese*, 790 F.2d 942, 953 (D.C. Cir. 1986) ("[A]dditional releases suggest a stronger, rather than a weaker, basis for accepting the integrity of the search … .") (internal quotation marks omitted). We therefore focus on the reasonableness of the search.

The type and scope of CIS's search was determined by its interpretation of Rubman's FOIA request as one for statistics. In general, "an agency … has a duty to construe a FOIA request liberally." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). Furthermore, DHS regulations require its subsidiary agencies to clarify ambiguous FOIA requests:

---

[3] We note that the D.C. Circuit now reviews all summary-judgment decisions in FOIA cases de novo. *See, e.g.*, *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992).

> If a component determines that your request does not reasonably describe records, it shall tell you either what additional information is needed or why your request is otherwise insufficient. The component also shall give you an opportunity to discuss your request so that you may modify it to meet the requirements of this section.

6 C.F.R. § 5.3(b). CIS did not consult Rubman because it found his request to be, unambiguously, a request for summary statistics.

FOIA states that "an agency shall provide [a] record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format."[4] § 552(a)(3)(B); *see also* 6 C.F.R. § 5.11(b)(3) ("Components shall honor a requester's specified preference of form or format of disclosure … ."); *DeLorme Pub. Co. v. Nat'l Oceanic & Atmospheric Admin.*, 907 F. Supp. 10, 12 (D. Me. 1995) ("An agency's duty is to disclose records, and records are formatted information. … Nothing in the FOIA excuses an agency from disclosing a particular record because it has disclosed the content elsewhere in a different format."). This means that agencies must be attentive not only to the *content* of the records sought by a FOIA request but also to their *form*. In

---

[4] This provision was added to FOIA in 1996 as part of the Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat. 3048, 3049 (codified as amended at 5 U.S.C. § 552(f)(2)). While it certainly indicates that a requester is entitled to electronic copies of documents if they're "readily reproducible," *see Sample v. Bureau of Prisons*, 466 F.3d 1086, 1088 (D.C. Cir. 2006), the language of "form or format" clearly cuts more broadly than electronic documents alone.

this case, unfortunately, CIS fixated on the former to the exclusion of the latter.

Rubman's initial request did not define the term "document," but that's hardly unusual. FOIA requesters often have no way to know exactly what type of records an agency has in its possession. But that doesn't mean Rubman's use of the word "document" could simply be ignored. A document may convey statistics, but it is not itself a statistic. Rubman's FOIA request itself drew attention to this distinction when it asked for "documents *reflecting* statistics" and "documents *that show* the requested data." (Emphases added.) *See also Forsham v. Harris*, 445 U.S. 169, 185 (1980) ("The Freedom of Information Act deals with 'agency records,' not information in the abstract.").

Furthermore, while the statistics that CIS assembled for Rubman were ultimately relayed to him in document form (first a four-page printout, then an e-mail attachment), we think that a FOIA request for "documents" is reasonably understood (at least presumptively) as one for preexisting internal agency records. "Records" for FOIA purposes are those that "the law requires the agency to prepare or which the agency has decided for its own reasons to create," *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 162 (1975), and that "have come into the agency's possession in the legitimate conduct of its official duties," *DOJ v. Tax Analysts*, 492 U.S. 136, 145 (1989). The data table that CIS created in response to Rubman's request was not produced or used in the course of CIS's administration of the H-1B program.[5]

---

[5] Additionally, "[t]he Act does not obligate agencies to create … documents." *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136,

The idea that a FOIA request for "documents" refers (again, at least presumptively) to preexisting internal records is not only most consistent with the broad scope of the records that are subject to FOIA, it's also most in line with FOIA's purpose of showing requesters "*what their government is up to.*" *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). A preexisting internal document enjoys marks of authenticity and accuracy that are absent from one generated by a FOIA officer. Genuine agency records also foster transparency by revealing—even if indirectly—something about the *way* the agency operates. The context-free data table of indeterminate origin released to Rubman furthered none of these policy goals.

CIS also failed to give due weight to Rubman's request for "document*s*"—plural—and more specifically for "all documents" about H-1B visa receipts. Even if the term "documents" were ambiguous, Rubman's request plainly envisioned something more than a single data table. In *LaCedra v. Executive Office for United States Attorneys*, the D.C. Circuit held that a FOIA request that opened by asking for "all documents" on a particular subject but later said it was "specifically" seeking records on two narrower topics should have been liberally construed as one for *all documents*. 317 F.3d 345, 347–48 (D.C. Cir. 2003). Rubman's case is much easier—his request never implied that he wanted anything

---

152 (1980). So FOIA would not have empowered Rubman to insist that CIS fulfill a request for a newly generated statistical table. This reinforces our conclusion that Rubman's request for "documents" is best understood as one for preexisting internal documents rather than newly generated statistics.

less than "all documents" reflecting statistics on the H-1B visa cap.

It's possible that Rubman's request was too "non-specific and unwieldy" to permit an effective search, as the district judge thought, though we note that CIS has never specifically lodged that objection, and the search was restricted to a four-year period. But if so, that's the exact situation addressed by 6 C.F.R. § 5.3(b): If Rubman's request did not "reasonably describe records," CIS was required to "give [him] an opportunity to discuss [his] request" and clarify it.[6]

We have no doubt that CIS believed in good faith that it was being helpful and efficient by generating a summary data table in response to Rubman's FOIA request. We certainly don't want to discourage agencies from providing raw data, database query results, or newly generated charts and tables when a FOIA request asks for them, when there are no other responsive records available, or when a requester consents to one of those formats. But when Rubman asked for "all documents reflecting statistics" and then objected to CIS's decision to respond with a newly generated summary table, the agency was required to search for records in the form specified in the initial request.

---

[6] If the scope of the search was the problem, CIS was also probably required to consult with Rubman under 6 C.F.R. § 5.11(e), which says that if an agency projects that a search will cost more than $25 (requesters are generally billed for the cost of the search), then it must both receive the requester's permission before proceeding and "offer the requester an opportunity to discuss the matter with Department personnel in order to reformulate the request to meet the requester's needs at a lower cost."

**2.** *The Response to Rubman's October 22 Letter*

After initially misinterpreting Rubman's FOIA request, CIS's subsequent actions failed to cure—and in fact exacerbated—the error. In his October 22 letter, Rubman unambiguously requested preexisting internal documents such as "statistical reports" and "emails." Eggleston, CIS's Director of FOIA Operations, responded that the disclosure of e-mails (she didn't address his request for reports) "would not provide you with an accurate calculation," "would not alter the outcome of the results that were provided to you," and "rather [would] only create additional confusion." Although agencies are not required to provide "explanatory material" along with the records they disclose, *see Sears, Roebuck & Co.*, 421 U.S. at 162, the risk of confusion is not a legitimate basis for refusing to perform a FOIA search.[7]

The district court thought that CIS was not required to perform a new search in response to Rubman's October 22 letter because it constituted a "modified" request. We recognize the importance of finality in the FOIA search process, and that "[r]equiring an additional search each time the agency receives a letter that clarifies a prior request could

---

[7] In her affidavit Eggleston insists that her statement that internal e-mails would confuse Rubman should not be interpreted as a concession that any responsive e-mails (or any other internal documents) exist. While we understand that CIS has not yet performed a search of preexisting internal documents, we are highly skeptical of CIS's suggestion that it might not have any such documents given its statutory and regulatory obligations to issue H-1B visas subject to the 65,000 cap. CIS also acknowledges that if Rubman filed a new FOIA request demanding preexisting internal documents, it would be obligated to perform such a search.

extend indefinitely the delay in processing new requests." *Kowalcyzk v. DOJ*, 73 F.3d 386, 388 (D.C. Cir. 1996). But Rubman's October 22 letter only requested "the documents [he] originally asked for" and then quoted the "all documents" language from his initial FOIA request. For the reasons discussed above, Rubman's initial request was properly understood to have been for preexisting internal documents. Once he made clear that he was not satisfied with CIS's counteroffer of a statistical table, the agency should have performed a search of its internal documents.

The cases cited by CIS on this point are not relevant because they all involved modified requests well outside of the scope of the original request. *See, e.g.*, *Larson v. Dep't of State*, 565 F.3d 857, 857 (D.C. Cir. 2009) ("[Plaintiff's] FOIA request gave no indication that she sought DOS documents regarding the agency's previous responses to her 1995 FOIA request."); *Kowalcyzk*, 73 F.3d at 389 (holding that a FOIA request sent to FBI headquarters and that made no reference to New York did not obligate the FBI to search records held in its New York field office). Agencies are entitled to make requesters refile (and go to the end of the queue) when they want to alter the parameters of their initial search request. But that's not what happened here, and neither CIS nor Rubman treated his October 22 letter as a modified request.

Finally, CIS argues that Rubman waived his objection to the data table when he failed to demand preexisting internal documents in his October 1 letter; instead he asked CIS to provide a "corrected response" that properly classified the visa receipts by year. We don't see it that way. "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458,

464 (1938). Rubman's willingness to entertain the possibility that an (accurate) data table could meet his needs did not mean that he intentionally relinquished his right to have his original request answered, particularly given that he never expressly disclaimed his desire for documents. A strict waiver rule would be inappropriate in the FOIA context; the statute is supposed to be administered with minimal procedural formality and "in a spirit of cooperation, recognizing that … agencies are servants of the public." Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 4683 (Jan. 21, 2009).


## III. Conclusion

For these reasons, we hold that CIS failed to conduct an adequate search in response to Rubman's FOIA request. Since CIS has never performed a responsive search (i.e., one of preexisting internal documents related to CIS's calculation of the H-1B visa cap from fiscal years 2009 to 2012), it must now do so. Of course, Rubman's request remains subject to the standard statutory and regulatory provisions related to FOIA searches; for example, CIS is entitled to withhold any records that fall under a statutory exemption, and it must consult with Rubman if it considers his request overbroad.

We REVERSE the summary judgment in favor of CIS and REMAND for additional proceedings consistent with this opinion.